**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SCALLION TRADING LTD.,

– against –

WILSON QIN and MITCHELL MARFINETZ,

Defendants.

Case No. 1:25-cv-2476 (JAM)

**MEMORANDUM OF LAW IN SUPPORT OF**
**WILSON QIN AND MITCHELL MARFINETZ'S RENEWED MOTION TO DISMISS**

MORVILLO ABRAMOWITZ
 GRAND IASON & ANELLO P.C.

Karen R. King
Thomas A. McKay
Peter Menz
565 Fifth Avenue
New York, NY 10017
(212) 856-9000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................................ 2

    I.     Qin, Marfinetz, and the ITGR Platform ................................................................... 2

    II.    Qin's Statements Regarding the ITGR Platform ................................................... 3

        a.    Statements Regarding Proceeds From the Public Seed Round ................................ 3

        b.    Statements Regarding the Potential "DAO" Conversion .................................... 4

        c.    Statements on Scallion's Website ............................................................. 5

    III.    Developments Since 2021 ..................................................................................... 6

    IV.    The Assignors Purchase Tokens in 2024 ............................................................. 7

LEGAL STANDARD ............................................................................................................. 8

ARGUMENT ......................................................................................................................... 9

    I.     Scallion's Securities Fraud Claim Should Be Dismissed ...................................... 9

        a.    The Complaint Does Not Identify Any False Statements Made By Qin ...................... 9

        b.    The Complaint Does Not Plead Scienter ................................................... 11

        c.    The Assignors Could Not Have Reasonably Relied On Qin's Statements ................. 13

        d.    Scallion Does Not Plead Economic Loss or Loss Causation .................................. 15

        e.    Scallion Seeks an Invalid Extraterritorial Application of the Securities Laws ............. 17

    II.    Each State Law Claim Fails on the Merits ................................................................ 19

        a.    The Complaint Does Not State a Claim for Common Law Fraud ............................ 19

        b.    No Contract Between Qin and the Assignors Exists .......................................... 20

        c.    Defendants Did Not Breach Any Fiduciary Duty ........................................... 22

        d.    Scallion Fails to Plead Unjust Enrichment at The Assignors' Expense ...................... 24

    III.    The Complaint Still Fails to Plead Any Plausible Claim as to Marfinetz ...................... 25

CONCLUSION ..................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)............................................................................................. 17

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
692 F.3d 34 (2d Cir. 2012)............................................................................................. 16

*Aiello v. Burns Int'l Sec. Servs. Corp.*,
110 A.D.3d 234 (1st Dep't 2013) .................................................................................. 22

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....................................................................................................... 13

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022)........................................................................................ 2, 12

*Shah v. Meeker*,
435 F.3d 244 (2d Cir. 2006)........................................................................................... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................................... 8

*Barron Partners, LP v. LAB123, Inc.*,
593 F. Supp. 2d 667 (S.D.N.Y. 2009) ........................................................................... 23

*Belesis v. Waksal*,
2017 WL 1390683 (S.D.N.Y. Apr. 18, 2017) ............................................................... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................................... 8

*Blank v. TriPoint Global Equities, LLC*,
338 F. Supp. 3d 194 (S.D.N.Y. 2018)............................................................................ 10

*Brown v. E.F. Hutton Group, Inc.*,
991 F.2d 1020 (2d Cir. 1993).......................................................................................... 14

*Burry v. Madison Park Owner LLC*,
84 A.D.3d 699 (1st Dep't 2011) .................................................................................... 22

*BWP Media USA, Inc. v. Gossip Cop Media, LLC*,
  87 F. Supp. 3d 499 (S.D.N.Y. 2015) ..................................................................... 4

*Cap. Mgmt. Select Fund Ltd. v. Bennett*,
  680 F.3d 214 (2d Cir. 2012) .............................................................................. 12

*Chien v. Skystar Bio Pharma. Co.*,
  256 F.R.D. 67 (D. Conn. 2009) .......................................................................... 17

*Chubb INA Holdings Inc. v. Hole in Won LLC*,
  2020 WL 774130 (S.D.N.Y. Feb. 18, 2020) ........................................................ 4

*Corsello v. Verizon N.Y., Inc.*,
  967 N.E.2d 1177 (N.Y. 2012) ............................................................................ 25

*Crestview SPV, LLC v. Crestview Financial, LLC*,
  217 A.D.3d 473 (1st Dep't 2023) ....................................................................... 25

*DeAngelis v. Corzine*,
  17 F. Supp. 3d 270 (S.D.N.Y. 2014) .................................................................. 10

*Douglas Elliman LLC v. Firefly Entertainment Inc.*,
  792 F. App'x 64 (2d Cir. 2019) .......................................................................... 22

*Dura Pharms, Inc. v. Broudo*,
  544 U.S. 336 (2005) ..................................................................................... 16, 17

*EBC I, Inc. v. Goldman, Sachs & Co.*,
  832 N.E.2d 26 (N.Y. 2005) ............................................................................... 23

*Edwards v. Sequoia Fund, Inc.*,
  938 F.3d 8 (2d Cir. 2019)............................................................................. 20, 22

*Elliott v. Qwest Comms. Corp.*,
  25 A.D.3d 897 (3d Dep't 2006) ......................................................................... 23

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  343 F.3d 189 (2d Cir. 2003)............................................................................... 13

*Fabian v. LeMahieu*,
  2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) ...................................................... 23

*Fan v. US Zhimingde International Group, LLC*,
  2020 WL 433529 (S.D.N.Y. Jan. 28, 2020) ....................................................... 16

*Finocchiaro v. NQ Mobile, Inc.*,
   2018 WL 1217728 (S.D.N.Y. Feb. 27, 2018) ............................................................. 15

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)........................................................................... 11, 26

*Gao v. Yang*,
   2022 WL 2193290 (S.D.N.Y. Jun. 17, 2022)............................................................. 10

*Grayson v. Ressler & Ressler*,
   271 F. Supp. 3d 501 (S.D.N.Y. 2017) ................................................................... 20

*Gurary v. Winehouse*,
   235 F.3d 792 (2d Cir. 2000)......................................................................... 12, 15

*Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*,
   64 A.D.3d 85 (2d Dep't 2009) ........................................................................... 20

*Hesse v. Godiva Chocolatier, Inc.*,
   463 F. Supp. 3d 453 (S.D.N.Y. 2020) ................................................................... 25

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995)............................................................................. 18

*In re Campbell*,
   547 B.R. 49 (Bankr. E.D.N.Y. 2016) ................................................................... 24

*In re Merrill Lynch Auction Rate Securities Litig.*,
   704 F. Supp. 2d 378 (S.D.N.Y. 2010) ................................................................... 15

*Iroquois Master Fund, Ltd. v. CEL-SCI Corp.*,
   2011 WL 1216688 (S.D.N.Y. Mar. 28, 2011) ........................................................... 24

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)...................................................................................... 10

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)............................................................................. 13

*Kolmar Americas Inc. v. Mycone Dental Supply Co., Inc.*,
   2021 WL 5054300 (S.D.N.Y. Nov. 1, 2021)............................................................. 22

*Kopelowitz & Co., Inc. v. Mann*,
   83 A.D. 3d 793 (2d Dep't 2011) ......................................................................... 24

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413 (1996) ............................................................................................... 15

*Lau v. Opera Limited*,
527 F. Supp. 3d 537 (S.D.N.Y. 2021) ..................................................................... 16

*Leykin v. AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006) ..................................................................... 10

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
797 F.3d 160 (2d Cir. 2015)..................................................................................... 16

*Luce v. Edelstein*,
802 F.2d 49 (2d Cir. 1986)................................................................................. 11, 12

*Mandarin Trading Ltd. v. Wildenstein*,
944 N.E.2d 1104 (N.Y. 2011) ................................................................................. 24

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..................................................................................................... 9

*Meimaris v. Royce*,
2019 WL 5722130 (S.D.N.Y. Aug. 20, 2019) ........................................................ 26

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007).................................................................................... 17

*Mills v. Polar Molecular Corp.*,
12 F.3d 1170 (2d Cir. 1993)..................................................................................... 12

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010) ................................................................................................ 17

*Nagelberg v. Meli*,
299 F. Supp. 3d 409 (S.D.N.Y. 2017) ............................................................... 24, 25

*NRP Holdings LLC v. City of Buffalo*,
916 F.3d 177 (2d Cir. 2019).................................................................................... 22

*Parisi v. Coca-Cola Bottling Co. of New York*,
995 F. Supp. 298 (E.D.N.Y. 1998).......................................................................... 25

*Precision Testing Labs, Ltd. v. Kenyon Corp. of Am.*,
644 F. Supp. 1327 (S.D.N.Y. 1986) ........................................................................ 24

*Risley v. Universal Navigation Inc.*,
 2025 WL 615185 (2d Cir. Feb. 26, 2025)...................................................................... 19

*S.E.C. v. Ripple Labs, Inc.*,
 682 F. Supp. 3d 308 (S.D.N.Y. 2023)) ........................................................................ 20

*Schatzki v. Weiser Capital Management, LLC*,
 995 F. Supp. 2d 251 (S.D.N.Y. 2014) .......................................................................... 24

*Scone Investments, L.P. v. American Third Market Corp.*,
 1998 WL 205338 (S.D.N.Y. Apr. 28, 1998) ................................................................ 19

*Sedaghatpour v. DoubleClick, Inc.*,
 213 F. Supp. 2d 367 (S.D.N.Y. 2002) .......................................................................... 14

*Shah v. Meeker*,
 435 F.3d 244 (2d Cir. 2006)............................................................................................ 14

*South Cherry Street, LLC v. Hennessee Group LLC*,
 573 F.3d 98 (2d Cir. 2009)............................................................................................. 10

*Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*,
 412 F.3d 103 (2d Cir. 2005)........................................................................................... 14

*Stoltz v. Fage Dairy Processing Industry, S.A.*,
 2015 WL 5579872 (E.D.N.Y. Sep. 22, 2015) ............................................................. 25

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
 676 F. Supp. 458 (S.D.N.Y. 1987) ............................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ....................................................................................................... 13

*Washington v. James*,
 782 F.2d 1134 (2d Cir. 1986).......................................................................................... 25

*Whiteside v. Hover-Davis, Inc.*,
 995 F.3d 315 (2d Cir. 2021)............................................................................................ 26

*Williams v. Binance*,
 96 F.4th 129 (2d Cir. 2024)....................................................................................... 17, 19

**Rules**

Fed. R. Civ. P. 8........................................................................................................... 25, 26
Fed. R. Evid. 201 .................................................................................................................. 8

<u>**PRELIMINARY STATEMENT**</u>

Integral is a cryptocurrency protocol that provides liquidity for digital asset markets. In 2021, the company developing Integral conducted an offshore offering of its proprietary token—ITGR—in compliance with the Securities and Exchange Commission's Regulation S. In connection with that offering, the company clearly and repeatedly disclosed that proceeds from the sale would be used to develop the Integral protocol. Consistent with those disclosures, proceeds from the sale were transferred out of a public cryptocurrency wallet (in transactions that were also public) and used for that purpose.

In May 2025, Plaintiff Scallion Trading Ltd. ("Scallion") brought this action alleging that (1) Defendant Wilson Qin had promised tokenholders a *pro rata* share of the funds raised and (2) Qin and Defendant Mitchell Marfinetz "stole" those funds. After Defendants showed that Plaintiff's original theory was demonstrably false, Scallion has amended twice in an effort to shift to a new theory. Scallion's Second Amended Complaint (ECF 31 ("SAC")) now asserts that Qin promised tokenholders they could have funds left over after the platform was developed and that Qin promised to let the tokenholders vote on how to dispense the proceeds if the platform failed. But yet again, these purported promises appear nowhere in the documents Scallion cites. And in light of its concession that the funds raised could properly be used to develop the platform, Scallion's continued bluster about "theft" is shameless. After two rounds of amendment, Scallion still cannot articulate a viable theory of liability.

In addition, both the federal and state law fraud claims fail because other central elements are not pleaded. Scallion offers no particularized allegations of scienter; it is unable to plead justifiable reliance in light of the public nature of all transfers; and allegations that the Assignors suffered *any* economic loss (much less one caused by Qin) are conspicuously absent from the SAC. Scallion also fails to plead any domestic purchase or sale of a security and therefore seeks

1

an impermissible extraterritorial application of the securities laws. It fails to identify any contract between the Assignors and Qin, nor any fact that would give rise to a fiduciary duty for Qin or Marfinetz. Scallion's unjust enrichment claim fails because there is no allegation of enrichment at Assignors' expense and the relief sought is duplicative of other claims. Finally, the SAC still lacks any substantive allegation about Marfinetz.

Scallion has been on notice of these deficiencies for more than half a year, yet has failed to cure them through multiple rounds of amendment. Given its repeated failure to plead a cognizable claim, the SAC should be dismissed with prejudice.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

The following factual background is drawn from the Second Amended Complaint (ECF 31 ("SAC")), as supplemented by documents that are "attached to the complaint," "incorporated in it by reference," or "integral to the complaint[.]" *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022).

### I. Qin, Marfinetz, and the ITGR Platform

ITGR is a cryptocurrency allegedly created by Qin. SAC ¶ 2. In public blog posts, Qin explained that these tokens would be associated with the Integral cryptocurrency protocol, which sought to become a "go-to liquidity pool for global consumer interfaces." SAC ¶ 11, Ex. 1 at 2. Qin further explained that the team working on the Integral protocol planned to "build[] components that will keep empowering the Defi [Decentralized Finance] revolution for the next 20 years." *Id.* ITGR was initially offered to the public through a "Public Seed Round"

---

[1] For purposes of a motion to dismiss, the well-pleaded factual allegations in a complaint are assumed to be true. *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 349. Defendants' recitation of the "facts" herein is based on the allegations in the complaint, is made solely for the purposes of this motion, and does not speak to the accuracy of any allegation.

beginning in April 2021. SAC ¶ 11. This offering "generated over $30 million worth of proceeds." SAC ¶ 21; *see also* Ex. 3 at 4 (blog post cited in SAC ¶ 14 stating that "we raised publicly on-chain: $31,946,832 from our Public Seed Round").

Marfinetz began working as the "primary spokesperson" for Integral in approximately March 2022. SAC ¶¶ 25, 27. Based on his use of the "first-person plural… to refer to ITGR management," Scallion asserts that Marfinetz has a "public leadership role" with Integral. *Id.* ¶¶ 25, 28-29. Although Marfinetz is identified as Integral's "primary spokesperson," none of the allegedly false or misleading statements are alleged to have been made by him.

## II. Qin's Statements Regarding the ITGR Platform

Scallion alleges that Qin, through an online username ("ProfessorJey") published numerous blog posts about the ITGR Token in 2021, SAC ¶¶ 10-17, and that these blog posts (together with other statements attributed to Qin) contained two promises that were not fulfilled.

### a. Statements Regarding Proceeds From the Public Seed Round

In blog posts regarding the Public Seed Round, Qin explained that "proceeds from the sale will be spent primarily to carry out Integral's long-term vision." SAC ¶ 11. Qin further specified that these expenses included "hiring team, dev and R&D, growth initiatives for expanding the user base, and economic support of Integral and its ecosystem." *Id.*; Ex. 1 at 3 (blog post cited in SAC ¶ 11).

Scallion asserts that "Qin raised far more money than he used to develop the Integral platform and promised that ITGR tokenholders owned a portion of those funds that exceeded the development costs," *id.*, defining that remainder as the "Net Sale Proceeds." No such language appears in the cited blog posts. In fact, the Risk Factor Exhibit published in connection with the

Public Seed Offering[2] expressly warned that the Integral team "may, directly or indirectly, use all of the Purchaser's investment to develop the Integral Tokens and the decentralized smart contract protocol" and "Purchasers may lose the entirety of their investments in the event that Integral Tokens and the decentralized smart contract protocol do not become operational." Ex. 8 at 5.

Throughout the fall of 2021, Qin published further blog posts providing updates on the development of the Integral protocol. SAC ¶¶ 13-15, 17. In these blog posts, Qin explained that fees earned by the Integral Protocol would accrue to the "protocol treasury" and that all "protocol values" and "protocol profits ('trade commissions,' 'exchange fees')" would "accrue to ITGR token holders." SAC ¶¶ 13-14. Similarly, a blog post that was allegedly "commissioned by Integral" further specified that "all trading fees… accrue to the ITGR token." SAC ¶ 16; Ex. 5 at 7. These blog posts did not contain any language representing that any "Net Sales Proceeds" (however labeled) would be reserved for tokenholders.

### b. Statements Regarding the Potential "DAO" Conversion

In other blog posts, Qin stated that ITGR was a "governance token" and that the Integral Protocol would eventually be run as a "Decentralized Autonomous Organization (DAO)." SAC ¶ 13. However, in the same blog post, Qin cautioned that "we are a startup in a volatile industry, any forecast we make is probably going to be wildly inaccurate." Ex. 2 at 3 (blog post cited in SAC ¶ 13). Similarly, on October 19, 2021, Qin made clear that there was no definite timeline for the plan to operate as a DAO. In response to a user question as to whether there was a

---

[2] This exhibit may be considered on a motion to dismiss because it appears on the Integral website (https://integral.link), the contents of which are repeatedly cited in the SAC as support for the notion that Qin made false statements. SAC ¶¶ 16, 18, 20. Accordingly, "the website has been incorporated by reference in the complaint." *Chubb INA Holdings Inc. v. Hole in Won LLC*, 2020 WL 774130, at *2 n.1 (S.D.N.Y. Feb. 18, 2020); *see, e.g.*, *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 503 (S.D.N.Y. 2015) (incorporating website by reference where Plaintiff "relies upon….[the] webpages, and includes screen captures of them, in the Amended Complaint").

"timeline" to "expect DAO infrastructure for ITGR," Qin stated that "the team has not finalized the plan on this yet and we will need to do more discussion/design." *Id.* ¶ 15; Ex. 4 at 2-3 (blog post cited in SAC ¶ 15). Scallion concedes that, in 2025, the "primary spokesperson for ITGR," *i.e.*, Marfinetz, publicly disclosed that the ITGR team had "initially planned to launch the DAO earlier, but made the strategic decision to wait for more favorable market conditions to ensure its success." SAC ¶¶ 26, 29.

### c. Statements on Scallion's Website

In addition to the "ProfessorJEY" blog posts, which are specifically alleged to have been authored by Qin, Scallion asserts that Qin is responsible for two posts on the Integral website, although neither post bears any reference to Qin or ProfessorJEY.

*First*, Scallion alleges that in a post "last updated on January 9, 2024," Qin "noted that tokenholders (a) would be able to vote on the management of the platform, (b) own the Treasury, and (c) additionally receive a portion of the Trading Fees," deriving these representations from the following post (the "Bullet Point Post"):

## Token Model

**ITGR holders will have ownership of:**

- Integral's governance
- Integral's community treasury
- Integral's profit (mainly trading fees)

SAC ¶ 18. Scallion also alleges that the Bullet Point Post demonstrated that "the Treasury… did not just hold the Trading Fees" but "also contained the Net Sale Proceeds." *Id.* ¶ 19. Because the Bullet Point Post itself makes no mention of the Offering Proceeds, much less of the "Net Sale Proceeds," the basis for this contention appears to be the fact that the term

"community treasury" is listed on a separate line than the parenthetical phrase "mainly trading fees".

*Second*, Scallion asserts that Qin "repeatedly represented that he would safely keep investor funds." SAC ¶ 20. The sole instance of this "repeated[]" representation is a page on the Integral website which states that "Integral has been implemented with security as priority." *Id.* While Scallion alleges that this webpage also stated that "Empirically … it [is] more profitable to put tokens into the [Treasury] pool than holding it in your wallet," the actual webpage does not discuss any treasury; Scallion added the word "Treasury" to the quoted statement in its SAC:



*Compare* Ex. 7 at 3 with SAC ¶ 20.

## III. Developments Since 2021

Consistent with Qin's prior representation that "proceeds from the sale will be spent primarily to carry out Integral's long-term vision," millions of dollars were withdrawn from the wallet where proceeds from the ITGR token sales were stored. SAC ¶¶ 21, 31-36.[3] Scallion alleges, without any basis, that such transfers constituted "theft." *Id.* ¶¶ 1, 3, 31, 41.

---

[3] Scallion identifies transfers totaling $20.462 million, but then asserts that the transfers, collectively, total approximately $31.5 million. As with many of the calculations in the Second Amended Complaint, it is unclear what accounts for this discrepancy.

Scallion admits (as it must) that work has been performed on the Integral platform between 2021 and May 2024 and accepts that Qin had disclosed that team members' salaries would extend to the millions. *Id.* ¶¶ 38-39. However, Scallion nonetheless asserts that the aforementioned transfers "cannot reflect good faith expenses or their own compensation for genuine development of the Integral platform since no one has performed $30 million worth of work on it." *Id.* ¶ 38. To support this contention, Scallion points to the following developments:

- Github, a website that "records work performed on the Integral platform," allegedly do not show work performed since May 2024 (although Scallion admits that these same Github records demonstrate that work was performed on the platform before that date).
- Qin no longer "regularly answer[s] investor questions in an 'office hours' feature."
- Marfinetz has not made any public posts since January 9, 2025.

SAC ¶¶ 38, 40.

### IV. The Assignors Purchase Tokens in 2024

Three individuals (the "Assignors") purchased ITGR Tokens in 2024, years after Qin published the "ProfessorJEY" blog posts described above. Nevertheless, the Assignors purportedly made their purchase "in reliance on Qin's public statements that each was purchasing a portion of the Treasury assets and the right to vote on the distribution of those assets." SAC ¶¶ 52, 58, 64. Each of the Assignors purchased their ITGR Tokens using a smart contract created by Qin. SAC ¶ 49 (defining this contract as the "Liquidity Contract Address"). Such a contract is "known in the cryptocurrency space as an Automated Market Maker." *Id.* Qin made an initial deposit of approximately 377,350 tokens to the Liquidity Contract Address, but the contract allowed "anyone to buy and sell ITGR in return for [another type of cryptocurrency token]." *Id.* The Assignors are alleged to have purchased approximately 9,319,242 tokens, or approximately 24 times the number of tokens that Qin is alleged to have deposited.

The SAC does not allege what the Assignors paid for the ITGR Tokens, only alleging that they have "suffer[ed] losses." *Id.* ¶ 53. The Assignors subsequently assigned their "claims" to Scallion pursuant to written agreements. *Id.* Although the SAC alleges that Scallion and the Assignors collectively own 13,677,841 ITGR Tokens, the number of tokens alleged to have been purchased by the Assignors only sums to 9,319,242. SAC ¶¶ 47-48. Because the SAC does not allege that Scallion purchased any ITGR Tokens, it is unclear what accounts for the discrepancy of more than four million tokens.[4]

Scallion Trading Ltd. is an English corporation that was formed on March 18, 2025.[5] Less than two months later, it filed this action, seeking relief on behalf of itself and unidentified "affiliates." ECF 1. Scallion has since identified the three Assignors but continues to resist disclosing further detail about how the Assignors acquired the ITGR Tokens, how Scallion came into existence, and how it acquired the Assignors' claims.

## LEGAL STANDARD

To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, a court should not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*

---

[4] Although Defendants noted this discrepancy in their first motion to dismiss, ECF 23 at 11, Scallion did not offer any explanation in its response, nor did it cure the discrepancy in its second amended complaint.

[5] Companies House, Scallion Trading Ltd., available at https://find-and-update.company-information.service.gov.uk/company/16323286; Fed. R. Evid. 201(b)(2).

**ARGUMENT**

**I.     Scallion's Securities Fraud Claim Should Be Dismissed**

To plead federal securities fraud, Scallion must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  The SAC lacks all but the third of these elements.[6]

**a.  The Complaint Does Not Identify Any False Statements Made By Qin**

Scallion's revised theory of liability posits that Qin made two specific promises: first, that ITGR tokenholders would be entitled to a *pro rata* share of the "Net Sales Proceeds" and "Trading Fees", and second, that ITGR tokenholders would be entitled to vote on the distribution of such proceeds once the Integral protocol converted into a Decentralized Autonomous Organization. SAC ¶¶ 11, 15, 19, 51, 55, 61, 69.  Neither alleged promise amounts to a false statement.

***Net Sales Proceeds and Trading Fees***: Scallion originally contended that Qin promised tokenholders pro rata shares of the so-called "Community Treasury," which purportedly contained all of the proceeds from the Public Seed Offering, as well as trading fees accrued by Scallion.  *See* ECF 23 at 12.  As Defendants conclusively demonstrated, that was not true: Qin explicitly disclosed that proceeds from the sale of ITGR tokens would be "primarily" used to develop the Integral Protocol.  *Id.* at 12-13.  Scallion has now revised its theory, alleging that Qin "raised far more money than he used to develop the Integral platform and promised that ITGR

---

[6] An evolving national debate exists as to whether cryptocurrencies qualify as securities. Defendants reserve, and do not waive, the argument that ITGR Tokens are not securities, but recognize that this argument is not suited for resolution at the pleading stage.

9

tokenholders owned a portion of those funds that exceeded the development costs." *Id.* The problem with its revised theory is that this promise appears nowhere in the blog posts that Scallion cites. *See* SAC ¶¶ 11-17; Exs. 1-4, 6. Rather than rely on what Qin actually said, Scallion impermissibly relies on "generic paraphrases." *Gao v. Yang*, 2022 WL 2193290, at *2 (S.D.N.Y. Jun. 17, 2022).

In fact, Scallion essentially concedes that none of the ProfessorJey-authored blog posts actually contain such a promise, instead urging the Court to find these posts misleading based on the later Bullet Point Post, which contains a purported "promise[] that the Treasury, which did not just hold the Trading Fees and that also contained the Net Sales Proceeds, belonged to ITGR tokenholders." SAC ¶ 19. This contorted argument has two problems. First, the SAC contains no "specific allegations that [Qin] w[as] involved with the creation, development, or maintenance of the websites or the information contained thereon," as necessary to hold him liable for a supposed misstatement. *Blank v. TriPoint Global Equities, LLC*, 338 F. Supp. 3d 194, 213 (S.D.N.Y. 2018) (applying *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (same result under New York law). As such, the Bullet Point Post cannot be fairly attributed to Qin. Second, even if the Bullet Point Post could be read as Scallion insists, the SAC concedes that spending money on the Integral platform was entirely proper and that Qin *did* in fact spend such money. As such, its conclusory and subjective allegations that the results do not reflect the amount invested, SAC ¶¶ 38, 40, merely amount to "speculat[ion] that there may have been… unlawful conduct," *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 114 (2d Cir. 2009), or (at most) "assertions of general mismanagement, or nondisclosures of mismanagement," which "cannot

10

support claims under § 10(b) of the Exchange Act." *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006).

***The DAO Vote***: As to the DAO Vote, Scallion ignores that only a "specific promise to perform a particular act in the future" can support a claim for fraud. *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986). In the cited blog posts, Qin disavowed any specific timeline for when the DAO would operate, consistent with his general warnings that "we are a startup in a volatile industry, any forecast we make is probably going to be wildly inaccurate." Ex. 2 at 3. Because any statements regarding any future vote were ambiguous and noncommittal, they are not sufficient to support a claim of fraud. *Luce*, 802 F.2d at 56 (where challenged statements made clear that potential benefits were "necessarily speculative in nature," no liability could be imposed).

Given the noncommittal nature of the statements that Qin actually made, Scallion again resorts to making things up. Paragraph 46 alleges, for instance, that "[t]he failure to conduct a vote harmed tokenholders because the vote was the mechanism that would allow investors to recoup their investment if Qin failed to develop the Integral platform, as Qin himself stated in a September 2, 2021, Substack post." No quote from that post (attached as Exhibit 2) appears in the SAC, because no such statement actually exists. At best, Scallion's misinterpretations are "unwarranted deductions" that cannot survive a motion to dismiss. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994); at worst, Scallion is clutching at straws in a futile attempt to salvage this case.

### b. The Complaint Does Not Plead Scienter

Scallion's revised theory makes clear that the purported "lie" is Qin's supposed failure to live up to his promises. For the reasons described in Section II(b), *infra*, no enforceable promise

existed.  But even on Scallion's own terms, this theory fails because the SAC does not allege that Qin "did not intend to do just what he promised at the times he made the promissory statements," and Scallion "therefore fail[s] to adequately plead the requisite reliance on false statements made... with scienter." *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000) (internal brackets and citations omitted).

As the Second Circuit has repeatedly explained, "[t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract" and only amounts to fraud if "when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).  As such, complaints that merely allege "a simple disagreement over the meaning of an ambiguous contract combined with a conclusory allegation of intent to breach at the time of execution" warrant dismissal.  *Cap. Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 226 (2d Cir. 2012).  Scallion provides no more here.

To demonstrate the supposed falsity of Qin's two "promises," Scallion alleges that neither prediction came to pass, ignoring that such a failure "does not constitute fraud if the promise was made with a good faith expectation that it would be carried out." *Luce*, 802 F.2d at 56.  The Second Amended Complaint contains zero allegations suggesting that Qin did not intend to perform or knew he could not perform, much less specific allegations that could "giv[e] rise to a strong inference of scienter." *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355.  Indeed, Scallion acknowledges that (consistent with the statements it relies on) Integral team members took salaries and performed work on the projects through May 2024.  SAC ¶¶ 38-39.  Although Scallion alleges transfers over the last few months are particularly suspect (*see* SAC ¶¶ 35-38), its concession that work *was performed on the platform when the statements at issue were made*

demonstrates, at most, that Qin "decided only at a later time to breach the [alleged] contract." *Belesis v. Waksal*, 2017 WL 1390683, at \*4 (S.D.N.Y. Apr. 18, 2017) (dismissing complaint for failure to allege scienter). Given the existence of such "plausible, nonculpable explanations," the SAC does not give rise to an "inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

At bottom, the SAC simply alleges that that Qin made a promise that he did not keep—"that ITGR tokens would confer upon tokenholders ownership of Treasury assets and the right to vote on the distribution of Treasury assets"—and that Qin "knew this was not true." SAC ¶¶ 55-56, 61-62. Such minimal allegations are "too speculative and conclusory to support scienter." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001). For that reason alone, the securities fraud claim fails.

### c. The Assignors Could Not Have Reasonably Relied On Qin's Statements

After alleging false or misleading statements, a securities fraud plaintiff must "establish reasonable reliance" on those false statements. *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003); *accord Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) ("[O]bjectively unreasonable reliance does not give rise to a Rule 10b–5 claim."). Although the SAC makes the conclusory assertion that the three Assignors purchased ITGR tokens "in reliance on Qin's public statements," such reliance was unreasonable as a matter of law.[7]

---

[7] As noted above, it remains unclear from the SAC whether Scallion owns any ITGR tokens itself, despite having been notified of this discrepancy by Defendants' prior motion to dismiss. To the extent that Scallion does own ITGR tokens, the SAC does not allege that Scallion relied on any statements by Qin in making such purchases.

The Second Circuit has repeatedly held that an investor "may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005) (quoting *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)). Thus, once a plaintiff is on "inquiry notice of... allegedly fraudulent practices," he ordinarily cannot plead reasonable reliance. *Shah v. Meeker*, 435 F.3d 244, 252 (2d Cir. 2006), *abrogated on other grounds by Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010); *see, e.g.*, *Sedaghatpour v. DoubleClick, Inc.*, 213 F. Supp. 2d 367, 375 (S.D.N.Y. 2002) (where facts were sufficient to "place[] plaintiff on inquiry notice of the alleged fraud as a matter of law," continued reliance by plaintiff was unreasonable as a matter of law).

Here, to demonstrate that Qin's statements were false, Scallion relies almost entirely on facts that were indisputably available to the Assignors when they made the purchases: the fact that certain transfers had occurred from the So-Called Community Treasury, and that no tokenholder vote had taken place as of 2024. As to the transfers, Scallion concedes that "ITGR tokens exist on a publicly available ledger…. that provides an immutable record of every ITGR transaction to have ever taken place" and that "all transactions to and from a given wallet can be viewed on the public blockchain," SAC ¶¶ 7-8, which enabled Scallion then to compile a detailed record of the transfers it challenges as illegitimate. *Id.* ¶¶ 31-37. Scallion conspicuously does not allege that the Assignors were actually unaware of these transactions when they purchased such tokens, nor that they believed a tokenholder vote had occurred. If these allegations are sufficient to state a claim for fraud, as Scallion contends, then they were sufficient to put the Assignors on inquiry notice of that alleged fraud. As such, no justifiable reliance exists. *Shah*, 435 F.3d at 252.

14

Although Scallion asserts that Qin "concealed" past thefts by "represent[ing] that Defendants did not previously steal Treasury assets and that people who bought ITGR tokens in 2024 would obtain voting rights," SAC ¶¶ 42, 52, Scallion points to no acts of concealment or deception. Instead, the SAC simply alleges that Integral's website still contained the Bullet Point Post in 2024. SAC ¶ 18. Again, the fact that the Bullet Point Post listed "Integral's community treasury" and "Integral's profit (mainly trading fees)" on separate lines appears to be the sole basis for Scallion's contention that this post "represented that Defendants did not previously steal Treasury assets" and "discussed spending those assets on platform development and then returning the remainder to tokenholders." *Id.* ¶ 42. Even if such a strained reading were credited (and it should not be), that formatting choice does not change the fact that the purported "thefts" that underlie Plaintiff's complaint were "disclosed in… sources that were widely available and easily accessible to" the Assignors, undercutting any claim of justifiable reliance. *In re Merrill Lynch Auction Rate Securities Litig.*, 704 F. Supp. 2d 378, 402 (S.D.N.Y. 2010). Indeed, the majority of the transactions Scallion identifies (totaling approximately $12.292 million) occurred in 2021 and 2022, before the Assignors purchased any ITGR tokens in 2024, at which time no tokenholder vote had taken place for over two years. Because these disputed transactions were "fully available to plaintiffs," *Finocchiaro v. NQ Mobile, Inc.*, 2018 WL 1217728, at *6 (S.D.N.Y. Feb. 27, 2018), reliance on the purported misstatements was therefore unreasonable.

### d. Scallion Does Not Plead Economic Loss or Loss Causation

Under federal and New York law, "[a] buyer defrauded in violation of the securities laws may recover only the excess of what he paid over the value of what he got, not the difference between the value of what he got and what it was represented he would be getting." *Gurary*, 235 F.3d at 799 (quotation marks omitted); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413,

421 (1996) (same rule under New York law).  Because it is not advancing a valid fraud claim, Scallion cannot allege "what the relevant economic loss might be and what the causal connection might be between that loss and the misrepresentation."  *Lau v. Opera Limited*, 527 F. Supp. 3d 537, 559 (S.D.N.Y. 2021) (quoting *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Scallion makes no effort to identify any economic loss resulting from the Assignors' purchase of ITGR tokens.[8]  While the First Amended Complaint (ECF 21 ("FAC")) asserted that the purchase price was "inflated," the SAC removes even this minimal detail.  *Compare* FAC ¶¶ 51, 57 with SAC ¶¶ 59, 65.[9]  As such, the SAC "does not provide any information—such as the number of [tokens] plaintiff acquired, the per-[token] price of defendant's [tokens] at the time of the investment, and the differential between that price and its current per-[token] price—that would have allowed us to infer that plaintiff suffered a loss."  *Fan v. US Zhimingde International Group, LLC*, 2020 WL 433529, at *3 (S.D.N.Y. Jan. 28, 2020) (dismissing securities fraud claim for failure to plead economic loss).  That is because Scallion actually seeks to enforce its purported contractual right to Treasury assets, rather than recover losses caused by fraud. Scallion's conclusory statement that the ITGR Tokens "used to reflect a pro rata ownership of a large Treasury" and now "reflect a pro rata ownership of a much smaller Treasury," SAC ¶ 51 does not demonstrate any "difference between the price paid and the value of the stock when bought," the relevant measure for fraud damages.  *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (internal quotation marks omitted).

---

[8] To the extent that Scallion owns any ITGR Tokens itself, it does not even plead these minimal details: the SAC contains no allegations regarding the purchase of any ITGR Tokens by Scallion.

[9] The impetus for this change appears to be the fact that Defendants correctly pointed out that Scallion was asserting an impermissible "inflated purchase price" theory.  ECF 23 at 19-21.  Rather than revise its theory, Scallion revised the label.

As a result, Scallion's allegations are also insufficient to establish loss causation, *i.e.*, that "the fraudulent statement that induced [the Assignors] to invest" also made the investment "more disposed to suffer the alleged harm…than honestly described alternative investments." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 186 (2d Cir. 2015); *see, e.g.*, *Chien v. Skystar Bio Pharma. Co.*, 256 F.R.D. 67, 72-73 (D. Conn. 2009) (imposing Rule 11 sanctions when complaint "d[id] not state when [plaintiff] purchased his shares, how much he paid for them, or whether he ever sold them, all facts that are critical for pleading loss causation"). Merely alleging that the Assignors believed their investment was "valuable" and were later disappointed, SAC ¶¶ 59, 65, is insufficient: "a mere disparity between the purchase price plaintiffs paid for [a security] and [the security's] true value at the time of purchase is insufficient to prove loss causation." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007). As the Supreme Court has recognized, permitting such "inflated purchase price" theories to go forward would "bring about harm of the very sort the [Private Securities Litigation Reform Act] seek[s] to avoid." *Dura Pharms.*, 544 U.S. at 347.[10]

### e. Scallion Seeks an Invalid Extraterritorial Application of the Securities Laws

Scallion's securities fraud claim also fails for the separate reason that it impermissibly seeks an extraterritorial application of the securities laws. The Securities Exchange Act applies only to "[1] securities listed on domestic exchanges, and [2] domestic transactions in other securities." *Williams v. Binance*, 96 F.4th 129, 136 (2d Cir. 2024) (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). Since Scallion does not allege that ITGR Tokens are listed on a United States exchange, it "must allege facts suggesting that irrevocable

---

[10] As noted above, *supra* n.9, Scallion's replacement of the word "inflated" with "valuable" in the SAC does not disguise the fact that they continue to assert an invalid inflated purchase price theory. *See* ECF 27-2 ¶¶ 59, 65 (redline amended complaint).

liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012).  It has not done so.

Although Scallion alleges that "[e]ach Assignor purchased his ITGR tokens directly from Qin, who sold them in the United States," SAC ¶ 49, such "conclusory allegations need not be credited…when they are belied by more specific allegations of the complaint."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  Here, the SAC's more specific allegations do not establish that any such direct sales occurred, and in fact are entirely inconsistent with Qin making such sales.

Specifically, the basis for the conclusion that these direct sales occurred is the allegation regarding Qin's creation of an automated market maker, *i.e.*, the Liquidity Contract Address.  As Scallion concedes, an automated market maker is a "smart contract" which "allows *anyone* to buy and sell ITGR in return for ETH tokens, and dynamically adjusts the price based on the updated quantities of each token."  SAC ¶ 49.  Thus, although Qin made an initial deposit of approximately 377,000 tokens to the Liquidity Contract Address, other ITGR token holders could "deposit their tokens" to the same place in order to "earn a fee on each trade."  *Id*.  In other words, Scallion admits that the Liquidity Contract Address permitted *other* ITGR holders to sell their tokens, defeating any inference that sales made through the Liquidity Contract Address necessarily involved Qin.  Indeed, because Qin only deposited approximately 377,000 tokens, *id.*, but Scallion and the Assignors claim to own more than *13 million*, *id.* ¶ 47, it is implausible to assume that Qin deposited the tokens now owned by Scallion and the Assignors—particularly in light of Scallion's further concession that there are over 85 million "circulating ITGR tokens." *Id.*  Furthermore, Scallion's insistence that Qin's control of the Liquidity Contract Address means he qualifies as the direct seller, *id.* ¶¶ 49-50, conflates two distinct concepts: whether Qin

18

exercised supervisory authority over the Liquidity Contract Address and whether he actually sold tokens to the Assignors. As the Second Circuit has recognized in an analogous context, "[i]n a decentralized cryptocurrency exchange… the hosts of the Protocol do not hold title to the tokens placed in the liquidity pool by third party users of the platform," and therefore do not "sell" the tokens that are purchased there. *Risley v. Universal Navigation Inc.*, 2025 WL 615185, at \*2-3 (2d Cir. Feb. 26, 2025) (affirming dismissal of claims brought under Section 12(a)(1) of the Securities Act, which requires defendants to be "sellers of the tokens in question"). Thus, allegations regarding Qin's authority over the Liquidity Contract Address do not establish actual sales.

In short, in light of the severe disparity between the number of tokens that Qin is alleged to have deposited and those alleged to have been purchased by the Assignors, the only plausible inference is that the ITGR tokens that form the basis of Scallion's claims were deposited by other ITGR token holders, *i.e.*, "third party users of the [Liquidity Contract Address]." *Risley*, 2025 WL 615185, at \*3; SAC ¶ 49 (conceding that the Liquidity Contract Address "allow[ed] anyone to buy and sell ITGR in return for ETH tokens"). Because SAC offers no details as to who those individuals might be or where the mechanics of those transactions took place, this Court lacks facts sufficient to evaluate "when and where the transaction became irrevocable," and therefore cannot permit Scallion's securities fraud claim to proceed. *Williams*, 96 F.4th at 136.

## II. Each State Law Claim Fails on the Merits

### a. The Complaint Does Not State a Claim for Common Law Fraud

Scallion's fraud claim fails because, as district courts in the Second Circuit have recognized, "the elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b–5." *Scone Investments, L.P. v. American*

*Third Market Corp.*, 1998 WL 205338, at *10 (S.D.N.Y. Apr. 28, 1998) (dismissing common law fraud claim where federal securities fraud claim failed). Accordingly, for the reasons stated above, Plaintiff's common-law fraud claim should also be dismissed.

### b. No Contract Between Qin and the Assignors Exists

To state a claim for breach of contract, a plaintiff must satisfactorily allege, *inter alia*, "the formation of a contract between the parties." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019). For two reasons, Scallion fails to do so here.

*First*, Scallion does not satisfactorily allege that any contract was formed between the Assignors and Qin. Under New York law, "[l]iability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties." *Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*, 64 A.D.3d 85, 104 (2d Dep't 2009). The Assignors did not purchase ITGR Tokens in the Public Seed Offering in 2021, SAC ¶ 52, and for the reasons explained in Section I(e), *supra*, Scallion does not plausibly allege that they ever directly transacted with Qin. Just as the purchase of a security in the open market does not give rise to a contractual relationship between the issuer and the holder, the purchase of ITGR tokens from third-party users of the Liquidity Contract Address does not give rise to any contractual relationship between the Assignors and Qin. *Cf. S.E.C. v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 328-29 (S.D.N.Y. 2023) (distinguishing between token holders who "knowingly purchased [token] directly from [issuer] pursuant to a contract" and "a secondary market purchaser who did not know to whom or what it was paying its money"); *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 676 F. Supp. 458, 475 (S.D.N.Y. 1987) (purchasers of securities in the open market lacked privity with issuer).

20

*Second*, alleging the formation of a contract requires that the plaintiff "set forth the material terms of the agreement, including the particular terms that were allegedly breached by the defendants." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 521 (S.D.N.Y. 2017). Here, Scallion concedes that the putative agreement depends only on the "promotional materials" cited in the SAC; it does not allege that any other statements or conduct by Qin gave rise to a contractual obligation. SAC ¶ 67. Although Scallion contends that these promotional materials contained promises that "purchasers of those tokens would obtain, among other things, a pro rata portion of the Net Sales Proceeds, after spending some Sales Proceeds on Integral platform development," *id.*, such a promise to remit the remainder cannot be found in the cited documents. *See* Section I(a), *supra*. Again, far from representing that "some Sales Proceeds" would be spent, Qin explicitly disclosed that proceeds from the sale of ITGR tokens would be "primarily" used to develop the Integral Protocol. SAC ¶ 11; *see also* Ex. 7 at 5 (Risk Factor Exhibit disclosure that the Integral team "may, directly or indirectly, use all of the Purchaser's investment to develop the Integral Tokens and the decentralized smart contract protocol" and "Purchasers may lose the entirety of their investments in the event that Integral Tokens and the decentralized smart contract protocol do not become operational").

Scallion also alleges that tokenholders would receive a vote once the Integral Protocol converted to a DAO and that, at that time, tokenholders would receive "revenue from ITGR transaction fees," SAC ¶ 67. Through these allegations, Scallion appears to conflate various statements regarding "profits" earned through the Integral Protocol, which were intended to be shared should the Integral Protocol convert to a DAO. *Id.* ¶¶ 14, 18. As explained above, however, no timeline regarding the DAO conversion was ever provided (with Qin expressly representing that many issues relating to the conversion remained unresolved). *See* Section I(a),

21

*supra*. For this reason, the documents relied on by Scallion are "so indefinite that it is not at all clear the parties were intending to enter into an . . . agreement in the first instance." *Douglas Elliman LLC v. Firefly Entertainment Inc.*, 792 F. App'x 64, 67 (2d Cir. 2019).

Scallion thus fails to allege facts showing a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 199 (2d Cir. 2019). In other words, "[p]er the communications attached to [Scallion's] own Complaint, the parties did not reach a meeting of the minds as to the material terms of the contract." *Kolmar Americas Inc. v. Mycone Dental Supply Co., Inc.*, 2021 WL 5054300, at *8 (S.D.N.Y. Nov. 1, 2021). Given the wholesale failure to identify any promise regarding the Net Sale Proceeds and the explicit reservation concerning any timeline for a DAO vote, the Court cannot find that the purported contract is "sufficiently definite" and therefore capable of judicial enforcement. *Aiello v. Burns Int'l Sec. Servs. Corp.*, 110 A.D.3d 234, 242 (1st Dep't 2013).[11]

### c. Defendants Did Not Breach Any Fiduciary Duty

Despite being warned of this deficiency in Defendants' pre-motion letter and prior motion to dismiss (ECF 19, 23), Scallion still does not plausibly allege "any authority for imposing a fiduciary duty on [Qin and Marfinetz]." *Burry v. Madison Park Owner LLC*, 84 A.D.3d 699, 700 (1st Dep't 2011). Scallion identifies several conclusory bases for the purported fiduciary duty, SAC ¶ 72, all of which are barred by binding law and the very documents cited in the SAC.

As an initial matter, the allegations that Qin "solicit[ed]…. investments with the assurance that he would keep the investments safe" and that Qin served "as the promoter and

---

[11] Moreover, any breach of contract claim based on the purported "trading fees" promise fails for the separate reason that Scallion fails to allege any such fees were diverted. *Edwards*, 938 F.3d at 12 (complaint must allege "failure of defendant to perform" to state a claim).

seller of ITGR tokens over which he had superior influence" appear to be variations on the same theory: Qin sold ITGR tokens.  SAC ¶ 72.  However, a fiduciary relationship requires "a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions."  *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005).  All Scallion alleges is a "simple business transaction between a potential investor and a company soliciting such investors," which is the paradigmatic example of an arms-length business transaction that creates no fiduciary duties.  *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 671 (S.D.N.Y. 2009) (quoting *Elliott v. Qwest Comms. Corp.*, 25 A.D.3d 897, 898 (3d Dep't 2006)); *accord Fabian v. LeMahieu*, 2019 WL 4918431, at *11 (N.D. Cal. Oct. 4, 2019) (dismissing claims against cryptocurrency promoters when allegations that fiduciary duty existed were based on "conclusory allegations of law").

Scallion's assertion that Qin "assur[ed]… that he would keep the investments safe" does not change this conclusion, as this allegation is based on blatant mischaracterization of the webpage cited in the SAC.  SAC ¶¶ 20, 72.  As detailed above, *see supra* at 6, not only does Scallion fail to link the webpage to Qin, but it outright modified a statement regarding Integral's liquidity pools by inserting the word "Treasury" in the version quoted in the complaint, in a transparent attempt to link irrelevant language to the supposed promise of safeguarding investor funds.  Scallion likewise makes no attempt to explain why the generic statement that "Integral has been implemented with security as priority" relates to this purported promise.

The final basis for imposing a fiduciary duty (and the only one that applies to Marfinetz) likewise fails.  Scallion asserts that Qin and Marfinetz served as "the administrators of the Treasury, which held assets on behalf of tokenholders."  SAC ¶ 72.  Asserting, without any factual support, that Qin and Marfinetz acted in a role "on behalf of tokenholders" simply

23

amounts to "mere legal conclusions that are dressed up as factual allegations."  *Iroquois Master Fund, Ltd. v. CEL-SCI Corp.*, 2011 WL 1216688, at *4 (S.D.N.Y. Mar. 28, 2011) (dismissing breach of fiduciary duty claim).  Put differently, Scallion simply applies a label to Defendants' conduct rather than alleging facts from which the existence of a duty can be inferred.  *Kopelowitz & Co., Inc. v. Mann*, 83 A.D. 3d 793, 798 (2d Dep't 2011) (courts need not accept "bare legal conclusions" as to the existence of a fiduciary duty).

### d.   Scallion Fails to Plead Unjust Enrichment at The Assignors' Expense

Finally, Scallion alleges that Qin and Marfinetz "collected Treasury assets for themselves that they should have kept for the benefit of ITGR tokenholders" and therefore were unjustly enriched.  SAC ¶¶ 76-77.  This claim fails for two separate and independent reasons.

*First*, alleging that a defendant "received benefits, standing alone, is insufficient to establish a cause of action to recover damages for unjust enrichment."  *Schatzki v. Weiser Capital Management, LLC*, 995 F. Supp. 2d 251, 252 (S.D.N.Y. 2014).  The plaintiff must also show that such benefits were received *at their expense*.  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011); *see, e.g.*, *Nagelberg v. Meli*, 299 F. Supp. 3d 409, 418 (S.D.N.Y. 2017) (unjust enrichment claim failed when defendants received money from person other than plaintiff, such that any "enrichment was not at plaintiffs' expense"); *Precision Testing Labs, Ltd. v. Kenyon Corp. of Am.*, 644 F. Supp. 1327, 1351 (S.D.N.Y. 1986) (unjust enrichment claim failed when defendant received benefits "at no expense" to plaintiff); *In re Campbell*, 547 B.R. 49, 62 (Bankr. E.D.N.Y. 2016) ("An award of damages as a result of an unjust enrichment claim is limited to restitution of the sum improperly received by the defendant from the plaintiff.").  Scallion makes no factual allegations to support this essential element.  Scallion concedes that the Assignors did *not* purchase the tokens through the Public Seed Offering in 2021 (SAC ¶ 47),

and therefore made no contribution to the $31 million worth of proceeds that Scallion spuriously contends were stolen. Moreover, it pleads no details as to what the Assignors actually paid for the ITGR tokens or at what price the tokens can now be resold, leaving this Court with no facts from which it can be inferred that they suffered a loss at all. *Cf. Nagelberg*, 299 F. Supp. 3d at 418 (no cause of action for unjust enrichment where "Plaintiffs' financial position would be exactly the same today" regardless of defendants' purported misconduct).

*Second*, unjust enrichment "is not a catchall cause of action to be used when others fail," such a claim is "not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Stoltz v. Fage Dairy Processing Industry, S.A.*, 2015 WL 5579872, at *26 (E.D.N.Y. Sep. 22, 2015) (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)). Because the unjust enrichment claim "relies on the same factual allegations and the same theory of liability" as all of Scallion's other claims—*i.e.*, the conclusory claims of "theft" and the false premise that token holders owned a *pro rata* share of ITGR sale proceeds—it is therefore subject to dismissal. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 474 (S.D.N.Y. 2020); *see, e.g.*, *Crestview SPV, LLC v. Crestview Financial, LLC*, 217 A.D.3d 473, 474 (1st Dep't 2023).

### III. The Complaint Still Fails to Plead Any Plausible Claim as to Marfinetz

Separate and apart from the legal deficiencies in Scallion's claims for breach of fiduciary duty and unjust enrichment, the continued inclusion of Marfinetz as a defendant is improper because Scallion does not satisfy its obligations under Fed. R. Civ. P. 8(a)(2). As explained in Defendants' pre-motion letter, Rule 8(a)(2) requires that a plaintiff provide "fair notice of the nature of the claim and the grounds upon which it rests," rather than "baldly conclusory" allegations. *Parisi v. Coca-Cola Bottling Co. of New York*, 995 F. Supp. 298, 300 (E.D.N.Y. 1998) (quoting *Washington v. James*, 782 F.2d 1134, 1140 (2d Cir. 1986)).

25

Despite amending the complaint twice, Scallion still offers nothing more than the conclusory assertion that Marfinetz committed "theft" or "stole" assets. *See, e.g.*, SAC ¶¶ 1, 6, 31, 46. "Alleging in conclusory terms that a defendant committed 'theft' or 'fraud' is not enough to state a cognizable claim, even under the relatively relaxed standard of Rule 8(a)." *Meimaris v. Royce*, 2019 WL 5722130, at \*14 n.24 (S.D.N.Y. Aug. 20, 2019) (noting that such "unadorned, the-defendant-unlawfully-harmed-me-accusation[s]" do not satisfy Rule 8). The only specific allegations as to Marfinetz relate to his role in public relations, and therefore do not provide any basis to infer that Marfinetz bears responsibility for the purported "theft" of assets. The SAC alleges that Marfinetz began "work with ITGR in approximately March 2022," serves as "the primary spokesperson" for the ITGR token, and posts on behalf of the ITGR token on various websites. SAC ¶¶ 25, 27. Although the SAC asserts that Marfinetz enjoys a "leadership role," the only basis for this conclusion is the fact that, at times, Marfinetz—who *concededly served in a public relations role*—has "used the first-person plural… to refer to ITGR management." SAC ¶ 27. When stripped of these "unwarranted deductions of fact," *First Nationwide Bank*, 27 F.3d at 771, the SAC contains no well-pleaded allegations that Marfinetz is responsible for the transfers of which Scallion complains, and Scallion therefore fails to nudge its claim "across the line from conceivable to plausible." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 323 (2d Cir. 2021).

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed. Because Scallion has been on notice of these pleading deficiencies and has had multiple opportunities to try to cure, dismissal should be with prejudice.

Dated:  January 9, 2026

Respectfully submitted,

MORVILLO ABRAMOWITZ
 GRAND IASON & ANELLO P.C.

*/s/ Karen R. King*
Karen R. King
Thomas A. McKay
Peter Menz
565 Fifth Avenue
New York, NY 10017
(212) 856-9000
kking@maglaw.com

*Counsel for Defendants Wilson Qin and
Mitchell Marfinetz*

**CERTIFICATE OF SERVICE**

I, Peter Menz, hereby certify that on January 9, 2026, a true and correct copy of the foregoing motion to dismiss, memorandum of law in support, and declaration of Karen R. King with annexed exhibits was served by electronic means via email upon William H. Newman, Esq., counsel for Plaintiff Scallion Trading Ltd.

*/s/ Peter Menz*
Peter Menz
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

**CERTIFICATE OF WORD COUNT**

I, Peter Menz, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing memorandum of law was prepared using Microsoft Word and the document contains 8,334 words as calculated by that application, excluding the parts of the Memorandum of Law exempted by Local Civil Rule 7.1(c).

*/s/ Peter Menz*
Peter Menz
565 Fifth Avenue
New York, NY 10017
(212) 856-9600
